IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | 2:08-CV-00393-LKK-KJM |
| Plaintiff, | ) | |
| v. | ) | |
| REAL PROPERTY LOCATED AT 730 GLEN-MADY WAY, FOLSOM, SACRAMENTO COUNTY, CALIFORNIA, APN: 072-2280-012, INCLUDING ALL APPURTENANCES AND IMPROVEMENTS THERETO, | ) | FINDINGS AND RECOMMENDATIONS |
| Defendant. | ) | |

Plaintiff United States of America applies ex parte under Local Rule A-540 for entry of a default judgment against the interests of certain individuals in the defendant real property and for a final judgment of forfeiture. As provided by Local Rule 72-302(c), the application was noticed for hearing before the undersigned on July 23, 2008. Assistant U.S. Attorney Courtney J. Linn appeared on behalf of the plaintiff United States of America. There was no appearance by or on behalf of any other person or entity claiming an interest in the defendant real property.

/////

/////

/////

1

For the reasons set forth below, the court FINDS AND RECOMMENDS as follows.

I. PROCEDURAL BACKGROUND

This is a civil forfeiture action against real property located at 730 Glen-Mady Way, Folsom, Sacramento County, California, Assessor's Parcel Number 072-2280-012 ("defendant real property") and more particularly described in the verified Complaint for Forfeiture In Rem filed February 21, 2008 (the "Compl.").[1] Christina Silvas Wilson ("Silvas") is the recorded owner of the defendant real property. See Compl. ¶ 3. The property is secured by a mortgage held by Wachovia Mortgage, FSB aka World Savings Bank, FSB (hereinafter "Wachovia"). See Wachovia's Claim filed March 26, 2008.

The complaint alleges that beginning in approximately February 2006 an individual named Stefan Andre Wilson ("Wilson") perpetrated an investment fraud scheme against numerous investors and obtained money from them. The complaint further alleges that the defendant real property was purchased in June 2006 with proceeds obtained from some of these investors. Based on these and other allegations, plaintiff alleges the defendant real property is subject to forfeiture because it constitutes or is derived from proceeds traceable to an offense constituting "specified unlawful activity" in violation of 18 U.S.C. §§ 1341 and 1343, and a conspiracy to commit such offenses and thus subject to forfeiture to the United States under 18 U.S.C. § 981(a)(1)(C).[2]

/////

---

[1] The defendant real property also is identified for forfeiture in a parallel criminal case. See United States v. Stefan A. Wilson aka Steven K. Wilson, 2:08-CR-0114 LKK. The government indicates that upon entry of a final judgment of forfeiture in this case it intends to seek dismissal of the forfeiture allegation against the defendant real property in the parallel criminal case.

[2] In the alternative, plaintiff alleges that Wilson and others conspired to commit an offense defined in 18 U.S.C. § 1957, in violation of 18 U.S.C. § 1956(h), and that the defendant property was involved in such a conspiracy, or is property traceable to such property, and therefore is subject to forfeiture to the United States under 18 U.S.C. § 981(a)(1)(A). Plaintiff also alleges in the alternative that Wilson and others committed, and conspired to commit, an offense defined in 18 U.S.C. § 1014, and that the real property constitutes or is derived from proceeds traceable to such violation. See 18 U.S.C. § 981(a)(1)(C).

      The record discloses that a copy of the Complaint and Notice of Complaint were posted at the defendant real property on or about February 26, 2008.  By order filed February 25, 2008, the court authorized public notice of the action to be published four times in <u>The Daily Recorder</u>.  Publication in a manner consistent with the court's order was made on March 13, 18, 25, and April 1, 2008, and the Proof of Publication was filed with the court on April 8, 2008.  Declaration of T. Teglia filed July 8, 2008 ("Teglia Decl.") ¶ 7.

      In addition to posting notice, and providing notice by publication, plaintiff also caused potential claimants to receive direct written notice as follows:

      1. On or about February 29, 2008, the Internal Revenue Service personally served the Verified Complaint for Forfeiture <u>In Rem</u>, Notice of Complaint, Application and Order for Publication, Lis Pendens, Order Requiring Joint Status Report, Notice of Availability of Voluntary Dispute Resolution, Notice of Availability of a Magistrate Judge and Notice of Forfeiture Action dated February 22, 2008 on Silvas at the defendant real property.  Teglia Decl. ¶ 3 & Ex. A.

      2. On February 22, 2008, copies of the above-referenced documents were sent by certified mail number 7007 2680 0000 4277 1841 to Wilson c/o Peter Kmeto, Wilson's former attorney in the parallel criminal case.  Teglia Decl. ¶ 4 & Ex. B.  On or about March 5, 2008, the Internal Revenue Service personally served the above-referenced documents on Wilson at the Sacramento County Jail located at 651 I Street, Sacramento, California.  Teglia Decl. ¶ 4 & Ex. B.

      3. On February 22, 2008, copies of the above-referenced documents were sent by certified mail number 7007 2680 0000 4277 1858 to Wachovia, which filed a claim and answer on or about March 26, 2008.  Plaintiff and Wachovia have stipulated to a resolution of Wachovia's claim.  <u>See</u> Stipulation for Final Judgment of Forfeiture filed July 18, 2008.

      Silvas and Wilson have not filed claims and the time for them to do so has expired.  <u>See</u> Rule G(5) of the Supplemental Rules of Civil Procedure for Admiralty or Maritime Claims and Asset Forfeiture Actions ("Supplemental Rules").  Accordingly, as provided by Rule

3

55(a) of the Federal Rules of Civil Procedure, on April 29, 2008, a Clerk's Certificate of Entry of Default was entered against the interest of Silvas and Wilson. By order filed June 25, 2008, the court extended the time for plaintiff to give direct written notice to victim/investors of Wilson's investment fraud scheme to allow plaintiff to seek a default judgment and address, among other things, whether judgment could be entered without such notice to them. See Stipulation and Order filed June 25, 2009 (docket no. 19).

Plaintiff now seeks entry of a default judgment against Silvas and Wilson, and the entry of a final judgment of forfeiture as against all other interests except that of Wachovia.

II. ANALYSIS

    A.    Procedural Requirements For Seeking a Default.

In an in rem action, the defendant property is usually brought before the court by means of process executed against the asset itself, the equivalent of service of summons and a complaint in an in personam action. See Supplemental Rule G(3). Potential claimants, in contrast, are not "served with process" in an in rem action so much as they are afforded notice of the action. See Supplemental Rule G(4). In modern civil asset forfeiture practice, notice to potential claimants takes two forms: publication to all potential claimants and direct written notice to known potential claimants.[3] Id.

        1.    Execution of Process.

In cases involving real property, Congress has eliminated the need for the issuance and service of a warrant of arrest in rem. 18 U.S.C. § 985(c)(3) ("If real property has been posted in accordance with this subsection, it shall not be necessary for the court to issue an arrest warrant in rem, or to take any other action to establish in rem jurisdiction over the property"); see also Supplemental Rule G(3)(a). Instead of arresting the real property, the government posts notice of the complaint on the property. 18 U.S.C. § 985(c)(1)(B). As noted, plaintiff complied with this requirement by causing posting of a notice of the complaint at the defendant real

---

[3] The requirements of due process have moved beyond mere publication, and include the requirement of direct written notice to persons who reasonably appear to be potential claimants. See Supplemental Rule G(4)(b) (and Advisory Committee Notes).

4

property on February 26, 2008.  See Department of Treasury Process Receipt and Return filed on March 4, 2008.

        2.        Publication of Notice.

Read together, Supplemental Rule G(4)(a)(iv)(A) and the local Admiralty Rules provide for notice of the forfeiture action by court-ordered publication in a newspaper of general circulation in the district where the action is filed.  See Supplemental Rule G(4)(a) (specifying the contents of publication, the frequency of publication, and the means of publication); Local Rule A-530 (specifying that publication shall occur by court order).  By order filed February 25, 2008, this court ordered notice by publication to occur in The Daily Recorder for four successive weeks.  Consistent with that order, plaintiff caused publication to occur in The Daily Recorder on March 13, 18, 25 and April 1, 2008.  See Proof of Publication for The Daily Recorder, filed on April 8, 2008.

        3.        Actual Notice to Owners.

The government must deliver "notice on the property owner(s), along with a copy of the complaint." 18 U.S.C. § 985(c)(1)(C).  Supplemental Rule G amplifies this statutory requirement.  Section 985 of Title 18 specifies that the government must send direct notice of the action and a copy of the complaint to any person who reasonably appears to be a potential claimant based on the facts known to the government before the end of the time for filing a claim under Rule G(5)(a)(ii)(B).  See Supplemental Rule G(4)(b)(1).  The local Admiralty Rules provide further that where, as here, the property owner retains custody of the property, notice shall be by personal service.  See Local Rule A-540(a)(2).

Plaintiff has complied with these notice requirements. It delivered personal notice to Silvas, the recorded owner of the defendant real property.  See Teglia Decl. ¶ 7.  It also noticed Wilson by personal service and by certified mail to his then attorney in the parallel criminal case. Id.; see also Supplemental Rule G(4)(b)(iii)(B) (expressly contemplating the giving of notice to a potential claimant's attorney in a parallel criminal investigation or case).  More than thirty days have passed since the date of publication, and more than thirty-five days have passed since the notice letters were served on and/or sent to Silvas and Wilson.

1          The Supplemental Rules do not provide a procedure for the government to seek a
2  default judgment in an action <u>in rem</u> against a potential claimant who fails to file a timely claim
3  and answer. Accordingly, the court looks to the Federal Rules of Civil Procedure. <u>See</u>
4  Supplemental Rule A(2). The Rules require the party seeking a default to first seek entry of a
5  clerk's default. <u>See</u> Fed. R. Civ. P. 55(a). Upon the entry of a clerk's default, plaintiff may then
6  seek entry of a default judgment against the non-appearing party. <u>See</u> Fed. R. Civ. P. 55(b)(2).
7          The Clerk of the Court properly entered the defaults of Silvas and Wilson on April
8  29, 2008. This court will now recommend that, as provided by Federal Rule of Civil Procedure
9  55(b)(2), the court enter default judgment against both potential claimants, Silvas and Wilson.

10    B.    <u>Factual Basis for Forfeiture.</u>

11          "The general rule of law is that upon default the factual allegations of the
12 complaint, except those relating to the amount of damages, will be taken as true." <u>Geddes v.</u>
13 <u>United Financial Group</u>, 559 F.2d 557, 560 (9th Cir. 1977) (citations omitted). "Rule 55 'tracks
14 the ancient common law axiom that a default is an admission of all well-pleaded allegations
15 against the defaulting party.'" <u>D.H. Blair & Co., Inc. v. Gottdiener</u>, 462 F.3d 95, 107 (2nd Cir.
16 2006) (citation omitted).

17          Here, the allegations in the complaint establish that the defendant real property is
18 subject to forfeiture. Those allegations, taken as true, show that Wilson engaged in an
19 investment fraud scheme that fleeced numerous victim/investors of millions of dollars, and that a
20 portion of those fraud proceeds can be traced directly to the purchase of the defendant real
21 property. In addition, the real property itself was purchased as part of a larger money laundering
22 conspiracy, and was derived not just from investment fraud proceeds, but also from false
23 statements made in the loan application used to secure the financing to purchase the property.
24 Accordingly, this court also will recommend that the allegations in the complaint, taken as true,
25 be deemed to establish a factual basis for the entry of a final judgment of forfeiture against the
26 defendant real property.
27 /////
28 /////

C.  Prudential Standing.

As discussed above, Supplemental Rule G(4)(b) requires plaintiff to send direct notice to "any person who reasonably appears to be a potential claimant on the facts known to the government before the end of the time for filing a claim."  Prior to making the pending motion for default judgment, the United States did not provide direct notice to the approximately sixty-five victim/investors of Wilson's investment fraud scheme.  See Declaration of Karen Ernst (Ernst Decl.) ¶ 2.  For the reasons explained below, these victim/investors are not entitled to direct notice because on the facts of this case they lack prudential standing.

The settled rule is that general creditors lack case or controversy standing under Article III to contest the civil forfeiture of specific property owned by their debtors.  See United States v. $20,193.39 U.S. Currency, 16 F.3d 344, 346-47 (9th Cir. 1994); see also 18 U.S.C. § 983(d)(6)(B) (excluding from the definition of "owner" a person with only a general unsecured interest in, or claim against, the property or estate of another).  In 2004, the court of appeals relaxed this rule in a case involving victims of a fraud scheme.  See United States v. $4,224,958.57, 392 F.3d 1002 (9th Cir. 2004) ("Boylan").  The Boylan case involved an individual named Sexton who persuaded seventy-eight individuals to send him money to invest.  Id. at 1003.  Contrary to his representations, Sexton shuffled the money around in various accounts in Liechtenstein, and in doing so committed mail and wire fraud and money laundering.  Id.  After the government of Liechtenstein repatriated approximately $4.25 million of these funds to the United States, the government filed a civil forfeiture action against the repatriated funds.  The government obtained a default judgment without noticing the seventy-eight victims of Sexton's scheme.  Subsequently, twenty-five of the seventy-eight victims came forward and filed claims.  Id. at 1004.  The district court rejected the claims, holding that the victims were unsecured creditors and therefore lacked standing to contest the civil forfeiture.  Id.  The court of appeals reversed, holding that if victims can prove they were defrauded, they are the beneficiaries of a constructive trust under California law and therefore have Article III standing to enter the forfeiture case itself.  Id. at 1005.  Because the government moved for a default judgment without giving notice to these potential claimants, the default judgment had to be set aside.  Id. at 1005.

On remand the court of appeals instructed the district court to convert the forfeiture action into something akin to a bankruptcy proceeding. "The district court is now to administer the [constructive trust], giving notice to all potential claimants and taking steps to assure that no claimant obtains more than his or her fair share." Id.

If the issue in this case were solely one of Article III standing, the Boylan decision would seemingly control. Like the victims in that case, victim/investors in this case have been defrauded based on the representations of an alleged con artist and money launderer, and the defendant real property was purchased with the commingled funds received from many of these victim/investors. As was the case in Boylan, the government now seeks a default judgment without giving direct notice to them. However, the government as plaintiff in this case is correct that the holding from Boylan is narrow: if the victim/investors can prove their claims to have been defrauded they have Article III standing to maintain claims in the forfeiture proceeding. Id. at 1005. In particular, the Boylan decision does not address the separate prudential strand of the standing doctrine. See United States v. Lazarenko, 476 F.3d 642, 651-52 (9th Cir. 2007) (holding that even if litigants had Article III standing to contest criminal forfeiture, "we would still dismiss because this case raises prudential concerns . . ."); see also Fulfillment Serv. Inc. v. United Parcel Serv., 528 F.3d 614 (9th Cir. 2008) (prudential standing addresses concerns apart from Article III standing). Thus, even if the Boylan decision suggests the government or the court must give direct written notice to the victim/investors in this case because it reasonably appears they have Article III standing, it does not preclude this court from reaching a different conclusion under the doctrine of prudential standing. See, e.g., Gonzales v. Department of Homeland Security, 508 F.3d 1227, 1235 (9th Cir. 2007) ("issues that are not raised or discussed are unstated assumptions on non-litigated issues [and] are not precedential holdings binding further decisions").

Prudential standing embodies judicially self-imposed limits on the exercise of federal jurisdiction. Elk Grove Unified School District v. Newdow, 542 U.S. 1, 11 (2004); Sprint Communications Co., L.P. v. APCC Serv., Inc., ___ U.S. ___, 128 S. Ct. 2531, 2544 (2008). Among other things, prudential standing encompasses the requirement that a litigant's

claim fall within the zone of interests protected by the law invoked. <u>Newdow</u>, 542 U.S. at 12; <u>see also</u> <u>Bennnet v. Spear</u>, 520 U.S. 154, 163 (1997). Congress is presumed to legislate against the backdrop of the prudential standing doctrine, which applies unless expressly negated. <u>Id.</u> Courts "employ the prudential standing doctrine to avoid usurping the legislature's role as the policymaking body in our separation of powers." <u>Get Outdoors II, LLC v. City of San Diego</u>, 506 F.3d 886, 891 (9th Cir. 2007).

The victim/investors lack prudential standing, and thus need not receive direct written notice of this action prior to the entry of judgment, because their interests are not within the zone of interests Congress intended to protect within this forfeiture proceeding. This conclusion flows from the structure and purpose of the civil forfeiture laws forming the basis for this action.

In April 2000, Congress amended Section 981, Title 18, United States Code, to provide that forfeited assets could be restored to crime victims of the offense giving rise to forfeiture. <u>See</u> 18 U.S.C. § 981(e)(6). The amendment reflects a policy choice to have the Attorney General use civil forfeiture laws as a means of restoring assets to crime victims. In adopting this forfeiture/victim remission model, Congress left it to the discretion of the Attorney General to address victim claims through a remission process that occurs after the successful prosecution of the forfeiture case. <u>See</u> 18 U.S.C. § 981(d) ("The Attorney General shall have sole responsibility for disposing of petitions for remission or mitigation with respect to property involved in a judicial forfeiture proceeding"); <u>United States v. One-Sixth-Share</u>, 326 F.3d 36, 45 (1st Cir. 2003) (family of murder victim has no standing to contest forfeiture of defendant's property: "Congress has provided for justice a different way; it has provided that the Government, which stands for all citizens, may take the criminal's property by forfeiture, and it has limited those who may assert competing claims").

The court is persuaded by plaintiff's argument that Congress's explicit referral of victims' claims to forfeited assets to the discretion of the Attorney General, combined with the absence of statutory language negating the application of the prudential standing doctrine to the potential claims of victim/investors, leads to the conclusion that victim/investors in this case lack

1  prudential standing.  See 18 U.S.C. § 983(d) (defining innocent owners entitled to protection
2  from forfeiture and omitting specific reference to crime victims).[4]  To decide otherwise, to
3  convert this forfeiture case into a trust administration proceeding, would shun the procedures
4  Congress deliberately enacted to vindicate victim interests in forfeited property, in contravention
5  of circuit precedent.  See Lazarenko, 476 F.3d at 652 ("Moreover, affording third parties standing
6  under the circumstances here, before a district court holds an ancillary proceeding, would shun
7  the procedures Congress deliberately enacted to vindicate third-party claims").[5]
8  　　　　The prudential standing analysis set forth above finds support in the court of
9  appeals' decision in United States v. Bright, 353 F.3d 1114, 1123–25 (9th Cir. 2004).  In Bright,
10 the defendant pleaded guilty to five counts of mail fraud and was ordered to pay restitution to the
11 victims of the fraud scheme.  Id. at 1116.  At sentencing, the district court inquired about the
12 availability of money that the Postal Service had seized and forfeited to satisfy the defendant's
13 restitution obligation.  Id. at 1117.  The prosecutor responded the forfeited assets were not
14 available for restitution.  Id.  On appeal, the defendant argued, among other things, that the
15 /////

---

[4]  The civil forfeiture statute that protects the rights of innocent owners against forfeiture does not expressly preclude application of the prudential standing doctrine in this case.  Section 984(d) of Title 18 provides protection against civil forfeiture to certain persons.  However, that protection is afforded only to certain categories of "innocent owners."  The term "owner" is defined to mean a "person with an ownership interest in the specific property sought to be forfeited, including a leasehold, lien, mortgage, recorded security interest, or valid assignment of an ownership interest."  18 U.S.C. § 983(d)(6)(A).  The statute excludes from the definition of "owner" persons "with only a general unsecured interest in, or claim against, the property or estate of another," who otherwise make no express provision for the claims of crime victims, whether the beneficiaries of a constructive trust remedy or not.  18 U.S.C. § 983(d)(6)(B).

[5]  A different decision also would be inconsistent with appellate decisions from outside this circuit.  See United States v. Schwimmer, 968 F.2d 1570 (2nd Cir. 1992) (referring to the parallel RICO criminal forfeiture provisions as "a statute that states that the Attorney General, and not the judiciary, shall make decisions about how to divide up the funds in order to compensate victims. . . .  Because Congress has chosen to allocate to the Attorney General the power to remit funds for victim compensation, it is inappropriate in the context of this case to relax conceptions of property rights in order to permit courts to compensate victims"); United States v. BCCI Holdings, 46 F.3d 1185, 1191-92 (D.C. Cir. 1995) (declining to recognize claim of general creditor, because "[w]ere it otherwise, the court litigating the forfeiture issue would be converted into a bankruptcy court," which "appears patently at odds with the statutory scheme, which directs parties without an interest in specific property to seek relief from the Attorney General, not the court adjudging the forfeiture").

district court's equitable Article III powers obligated it to order that the forfeited funds be applied toward restitution. Id. at 1124.

The court of appeals rejected the argument, noting that the exercise of Article III equitable power presumes a right of action and Congressional silence on the question of remedies. Id. at 1124. The forfeiture statutes, the court concluded, do not lend themselves to the exercise of such equitable power. In language that anticipates the prudential standing issue raised in this case, the court wrote: "Requiring district courts to attempt to apply forfeited funds toward restitution would not carry out [the Civil Asset Forfeiture Reform Act's (CAFRA)] mandate, but rather would conflict with the grant of discretion CAFRA expressly and specifically gives to the Postal Service." Id. at 1124. These considerations – concerns about reaching a decision in conflict with Congress's grant of discretion to the Attorney General – come to bear here as well.

Additional considerations support the conclusion that the victim/investors lack prudential standing. First, a practical consequence of Boylan's Article III standing analysis is that it grafts a restitution remedy for crime victims onto the back of the government's authority to preserve assets for forfeiture by seizing, restraining or, as in this case, by filing a lis pendens. See 18 U.S.C. § 985(a)(2). The policy choice, however, to import asset forfeiture-like asset preservation authority directly into the victim restitution statute is one for Congress to make.

Second, the decision to convert this action into a Boylan-style trust administration is neither necessary to protect the individual rights of victim/investors nor would it be judicially efficient. Doran v. 7-Eleven, Inc., 524 F.3d 1034, 1046 (9th Cir. 2008) (recognizing that concerns of judicial economy properly affect the resolution of prudential standing issues). The individual rights of victims to restitution already are protected - or will be - through the remission process that Congress provided. See 18 U.S.C. § 981(e); 28 C.F.R. § 9.8. A Boylan-style trust proceeding would effectively duplicate work the Attorney General already is performing. See 28 C.F.R. § 9. Moreover, if the defendant is convicted of an offense giving rise to restitution in the parallel criminal case, the judicial effort entailed in administering a Boylan-style trust would
/////

11

overlap with work the court will perform in the parallel criminal case under the Mandatory Victim Restitution Act.  <u>See</u> 18 U.S.C. §§ 3663A, 3664.

There may be circumstances where a fraud victim may have both Article III standing under the rationale of <u>Boylan</u> and prudential standing to maintain a claim within a civil forfeiture proceeding.  These circumstances are not presented in this case.

For the foregoing reasons, it is hereby recommended:

1. That Christina Silvas Wilson and Stephen Wilson be held in default;

2. That plaintiff's motion for default judgment and final judgment of forfeiture be granted;

3. That a judgment by default be entered against any right, title or interest of potential claimants Christina Silvas Wilson and Stephen Wilson in the defendant real property;

4. That a final judgment be entered, forfeiting all right, title and interest in the defendant real property to the United States of America, subject to the Stipulation for Final Judgment of Forfeiture filed July 18, 2008, which stipulation is incorporated herein;

5. That title to defendant real property should vest solely in the name of the United States of America;

6. That the court enter a Certificate of Reasonable Cause, pursuant to 28 U.S.C. § 2465, that there was reasonable cause for the posting of the defendant property;

7. That the court confirm that the investors and victims in the underlying fraud scheme giving rise to this action are not entitled to direct written notice because they lack prudential standing to intervene as claimants in this forfeiture action; and

8. That a proposed Order adopting and effecting these findings and recommendations and incorporating a Default Judgment and Final Judgment of Forfeiture be submitted by plaintiff for the court's consideration within ten days of the date of these findings and recommendations.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty days after being served with these findings and recommendations, any party may file written

objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections shall be served and filed within ten days after service of the objections.  The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

DATED:  November 17, 2008.

_____
U.S. MAGISTRATE JUDGE